UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------
MELISSA G. KING,

                    Petitioner,                    10-cr-122 (JGK)
                                                   14-cv-7962
          - against -

                                                   MEMORANDUM OPINION
UNITED STATES OF AMERICA,                          AND ORDER

                    Respondent.
-----------------------------------

**JOHN G. KOELTL, District Judge:**

The petitioner, Melissa G. King, moves *pro se* pursuant to
28 U.S.C. § 2255 to vacate and set aside her 72-month sentence
of imprisonment, which was entered following her guilty plea to
one count of embezzlement from employee benefit plans, in
violation of 18 U.S.C. §§ 664 & 2, and to one count of
subscribing to false United States individual tax returns, in
violation of 26 U.S.C. § 7206(1). The petition and its
supporting memorandum (collectively, the "Petition") --- which
were filed over a year after the statute of limitations expired
--- raise a host of claims: among others, that the guilty plea
was not knowing, intelligent, or voluntary; ineffective
assistance of counsel; prosecutorial misconduct; actual
innocence; and violation of the Cruel and Unusual Punishments
Clause of the Eighth Amendment.

In response to the request of this Court, see Civ. Dkt. 26,
the attorneys that represented the petitioner in the underlying

criminal proceedings have submitted declarations and an affidavit to address the ineffective assistance of counsel claims. See Civ. Dkt. 32 (Fontier Declaration); Civ. Dkt. 33 (Schachter Affidavit); Civ. Dkt. 34 (Handwerker Declaration) (collectively, the "Attorney Affidavits").

For the reasons explained below, the Petition is **dismissed**.

### I.

### A.

On February 17, 2010, the petitioner was charged in an Indictment with one count of embezzlement from employee benefit plans, in violation of 18 U.S.C. §§ 664 & 2, and with eleven counts of money laundering, in violation of 18 U.S.C. §§ 1957 & 2. See Cr. Dkt. 12. The Indictment alleged that the petitioner served as the third-party administrator for the employee benefit plans of a union, the Compressed Air and Free Air Foundations, Tunnels, Caissons, Subways, Cofferdams, Sewer Construction Workers Local 147 of New York, New Jersey States and Vicinity AFL-CIO ("Local 147"). The Indictment alleged that the petitioner embezzled approximately $40 million from three of Local 147's employee benefit plans through King Care LLC ("King Care"), a company the petitioner controlled, which served as the fund manager for the funds pursuant to an administrative agreement, and that the petitioner then laundered the embezzled

funds through a series of bank accounts. <u>See</u> Cr. Dkt. 12 at 4-5. The petitioner pleaded not guilty.

At the time the Indictment was filed, the petitioner was represented by retained counsel, Peter William Till ("Till") of the Law Offices of Peter W. Till.[1] <u>See</u> Cr. Dkt. 3. The petitioner retained two additional lawyers, Michael Handwerker ("Handwerker") of Goldstein & Handwerker, LLP, who appeared on behalf of the petitioner in March 2010, and Ronald K. Smith ("Smith"), a solo practitioner, who appeared on behalf of the petitioner in June 2010. <u>See</u> Cr. Dkts. 21, 23, 25, 30. On June 15, 2010, Till moved to withdraw as the petitioner's attorney. <u>See</u> Cr. Dkts. 28-29. The petitioner --- citing "irreconcilable differences" and a "breakdown in communications" with Till, as well as her belief that Handwerker could adequately represent her in the matter --- did not oppose Till's motion, <u>see</u> Cr. Dkt. 32, which was granted on July, 2, 2010, <u>see</u> Cr. Dkt. 34.

On June 30, 2010, a Superseding Indictment was filed, adding one count of mail fraud, in violation of 18 U.S.C. §§ 1341 & 2, and four counts of tax evasion, in violation of 26 U.S.C. § 7201. <u>See</u> Cr. Dkt. 35. Over the next year, in numerous filings, the Government and counsel for the petitioner battled over a series of dispositive and non-dispositive issues, ranging

---

[1] Till also represented the petitioner in a civil action brought by the trustees for Local 147's funds against the petitioner. <u>See</u> <u>Fitzsimmons v. King Care, LLC</u>, 09-cv-05506 (PAE) (S.D.N.Y.).

from the post-indictment restraint and preservation of the petitioner's assets, to the dismissal of the superseding indictment, to the suppression of post-arrest statements. <u>See</u> <u>United States v. King</u>, No. 10 CR. 122 (JGK), 2011 WL 1630676 (S.D.N.Y. Apr. 27, 2011); <u>United States v. King</u>, No. 10 CR. 122 (JGK), 2010 WL 4739791 (S.D.N.Y. Nov. 12, 2010).[2]

Due in part to the post-indictment freeze of the petitioner's assets, the petitioner lost the ability to pay for Smith and Handwerker. <u>See</u> Cr. Dkt. 128. On March 14, 2011, at the request of the petitioner, Michael S. Schachter ("Schachter") of Willkie Farr & Gallagher LLP ("WFG") was appointed to represent the petitioner pursuant to the Criminal Justice Act (the "CJA"), 18 U.S.C. § 3006A. <u>See</u> Cr. Dkt. 130. Because the petitioner could no longer pay for retained counsel, on March 23, 2011, Handwerker was temporarily appointed to the CJA Panel so that Handwerker could continue representing the petitioner pursuant to the CJA. Cr. Dkt. 136. The purpose of the dual representation was to provide the petitioner with the benefit of her choice of counsel, Handwerker, and the experience

---

[2] On January 24, 2011, "a second superseding indictment was filed. The primary effect of the second superseding indictment was to amend the 'to wit' clause of Count One, to replace an allegation that the defendant 'embezzled tens of millions of dollars' to one that the defendant 'embezzled, stole, abstracted and converted tens of millions of dollars.'" <u>King</u>, 2011 WL 1630676, at *1.

of Schachter, along with the resources of a larger firm, WFG, that could review the immense amount of discovery in the case.

As counsel for the petitioner, Handwerker and Schachter continued to contest issues in the case, including by moving *in limine* to exclude certain evidence. See, e.g., Cr. Dkts. 192, 209. While preparing for the possibility of a trial, the petitioner also negotiated with the Government regarding the possibility of a disposition short of trial.

On October 21, 2011, the petitioner waived her right to be indicted by a grand jury, and consented to being charged in a Superseding Information S3 10 Cr. 122 (JGK) (the "Information"). See Cr. Dkt. 218. The Information charged the petitioner with one count of embezzlement from employee benefit plans, in violation of 18 U.S.C. §§ 664 & 2 ("Count I"), and with one count of subscribing to false United States individual tax returns, in violation of 26 U.S.C. § 7206(1) ("Count II").

On the same date, the petitioner appeared before this Court, and pleaded guilty to both Counts in the Information pursuant to a plea agreement dated October 20, 2011 (the "Plea Agreement") with the Government. The Plea Agreement contained a waiver by the petitioner of any direct appeal or collateral challenge of any sentence of or below the Stipulated Guidelines Range of 96 months' imprisonment. Plea Agr. at 8-9. The Plea Agreement also noted that, for the purposes of calculating the

Sentencing Guidelines offense level, the petitioner and the Government disputed the loss amount attributable to the petitioner's conduct: the petitioner contended that the loss amount was between $7 million and $20 million, while the Government contended that the loss amount was between $20 million and $50 million. Plea Agr. at 7. This was a sentencing issue that did not affect the petitioner's ability to plead guilty to Counts I and II of the Information. Indeed, the Stipulated Guidelines Range of 96 months' imprisonment was based on the statutory maximum sentence for the two Counts of conviction. Under both the Government's calculations and the petitioner's calculations, the Guideline Sentencing Range would have been higher if it were not capped by the statutory maximum sentence.

At the petitioner's guilty plea, this Court conducted an allocution in conformity with Rule 11 of the Federal Rules of Criminal Procedure. The petitioner was placed under oath and then answered a series of questions establishing that she was competent to enter a guilty plea. Plea Tr. at 9-13. For example, the petitioner explained that she was highly educated: she had a master's degree, and had nearly completed a Ph.D. Plea Tr. at 10.

The petitioner also explained that she had had psychiatric treatment for post-traumatic stress "a couple of years ago" and

that she was separately being treated for several physical ailments --- namely, back problems and "a chronic infection." She swore that her past psychiatric condition and treatment "[a]bsolutely [did] not" affect her ability to understand the proceedings and to consult with her lawyer. Plea Tr. at 10-12. She also swore that her physical condition did not interfere with her ability to understand the proceedings and to consult with her lawyer. Plea Tr. at 12. The petitioner swore that her mind was clear; that she wanted to proceed with the plea allocution; and that she had not taken any drugs, medicine, pills, or alcohol in the preceding 24 hours. Plea Tr. at 12-13. Counsel for the petitioner, and the petitioner herself, confirmed that "nothing about [the petitioner's] physical condition in any way impact[ed] her ability to proceed with the guilty plea." Plea Tr. at 5-8. The guilty plea allocution occurred in the afternoon at 4:35 p.m. The petitioner's counsel confirmed that the petitioner had refrained from taking her medication so that she could participate in the guilty plea allocution that afternoon. Plea Tr. at 6.

The petitioner also swore that she had "extensive discussion" with her counsel regarding her case, and the consequences of waiving indictment, proceeding by information, and entering a guilty plea. Plea Tr. at 14. The petitioner swore

that she was satisfied with Schachter's representation of her --- "very much so." Plea Tr. at 14.

On the basis of the petitioner's responses to this Court's questions, and the Court's observations of her demeanor, this Court found that the petitioner was "fully competent to waive indictment, agree to proceed by information, and enter an informed plea." Plea Tr. at 14.

The petitioner acknowledged the various rights that she was giving up by pleading guilty. Plea Tr. at 14-17. The petitioner acknowledged that she consented to being charged by information rather than indictment. Plea Tr. at 17-19. The petitioner was advised of the nature of the charges to which she was pleading guilty, Plea Tr. at 20-23, the maximum penalties for those charges (including restitution), the possibility of forfeiture, and the implications of any term of supervised release. Plea Tr. at 21-28.

As to the Plea Agreement, the petitioner acknowledged that she signed it, that she discussed it with her counsel before signing it, and that she fully understood it before signing it. Plea Tr. at 28-29. She affirmed under oath that no one had offered her any inducements, or threatened her, or forced her to plead guilty or to enter into the Plea Agreement. Plea Tr. at 29. The Court discussed with the petitioner the provision of the Plea Agreement in which the petitioner agreed to waive her right

to file an appeal or collateral challenge of any sentence of or below the Stipulated Guidelines Range. Plea Tr. at 29-30. The petitioner swore that she understood the provision:

> THE COURT: So, do you understand that if I sentence you to any sentence of 96 months' imprisonment or less, you have given up your right to appeal any such sentence or challenge any such sentence in any proceeding including any habeas corpus proceeding? Do you understand that?
>
> THE DEFENDANT: I understand that.

Plea Tr. at 30. The Court ensured that there was an adequate factual basis for the petitioner's guilty plea, that the petitioner was aware that her actions were illegal, and that venue was proper. Plea Tr. at 32-38. Regarding Count I, the petitioner explained that, between 2002 and 2008, she served as a third-party administrator for three of Local 147's employee benefit retirement funds. Plea Tr. at 32-33. The petitioner swore that she "caused to be transferred a substantial amount of money from the bank accounts for those funds into King Care" and then "caused that money to be transferred for [her] own use rather than for the benefit of the funds for the participants of the funds." Plea Tr. at 33. The petitioner swore that she "knew [she] was not entitled to the money and [she] knew that [what] [she] was doing [was] wrong, unlawful, and unauthorized," and that she "was aware that those funds were governed by ERISA at the time." Plea Tr. at 33. She affirmed in response to a

question by the Court that she "knew that [she] [was] not entitled to those funds . . . ." Plea Tr. at 33.

Regarding Count II, the petitioner swore:

I also willfully and knowingly subscribed and filed personal tax returns between 2004 and 2007 that were false as to material matters. I knew that the tax returns were false because they did not report a substantial amount of income I received from King Care. I verified the false tax returns by written declaration that they were made under penalties of perjury.

Plea Tr. at 33. The petitioner swore that she knew that what she was doing was wrong and illegal. Plea Tr. at 34.

In addition, the petitioner swore: "I accept full responsibility for my actions which I deeply regret and I am sorry for the harm that my actions caused to others, especially to the participants of the funds." Plea Tr. at 33.

The Government summarized the evidence against the petitioner that would have been introduced at trial. The evidence would have included "law enforcement and lay testimony, bank records and other financial records, records of the [petitioner's] purchases, records of Local 147 funds including statements mailed to participants, board of directors' minutes, forms filed with the Department of Labor, tax returns and accounting records for the [petitioner] including [the petitioner's] personal tax returns." Plea Tr. at 35. The Government explained that the evidence would show that the

petitioner was a third-party administrator for three of Local 147's funds; "that between 2002 and 2008 she took over $40 million from the [funds'] account and placed it into her personal account"; that "[s]he spent a substantial portion of that [money] on many personal expenses including horses, jewelry, travel and private jets, luxury hotels, her home in Irvington, credit card bills for additional personal expenses and two Park Avenue apartments in Manhattan"; and that "[n]one of these expenses were justified by her contracts, nor were those expenses authorized by the trustees of the Local 147 funds." Plea Tr. at 35-36. The Government also explained that the evidence would show that, for "the tax years 2004 through 2007[,] [the petitioner] filed tax returns . . . that were signed under penalty of perjury[,] [which] failed to declare her income from the embezzlement[,] understating her income by millions of dollars" even though the petitioner knew "that those returns contained material misstatements." Plea Tr. at 36. The Government stated that the evidence would establish the elements of each of the crimes beyond a reasonable doubt. Plea Tr. at 36.

The petitioner pleaded guilty to both Counts I and II. Plea Tr. at 36-37. The petitioner also noted that she disputed the $40 million loss amount proffered by the Government. Plea Tr. at 36-37. This Court noted that the disagreement over the loss amount was reflected in the Plea Agreement, and that the exact

amount of money embezzled was not an element of any offense.
Plea Tr. at 37; see also Plea Agr. at 7. In response, the
petitioner twice affirmed that she was knowingly and voluntarily
pleading guilty to Count I even though she would be disputing
the ultimate loss amount for sentencing purposes. Plea Tr. at
37, 39. The petitioner swore that she was pleading guilty to
both Counts because she was in fact guilty, and that she was
pleading guilty voluntarily and of her own free will. Plea Tr.
at 37. Neither counsel for the petitioner nor the Government
could offer a reason for this Court not to accept the
petitioner's guilty plea. Plea Tr. at 37-38.

At the conclusion of the proceeding, the Court found that
the petitioner understood the rights that she was giving up by
pleading guilty and the consequences of her plea, and that she
did so knowingly and voluntarily. The Court further found that
the petitioner acknowledged her guilt, that the plea was entered
knowingly and voluntarily, and that the plea was supported by an
independent basis in fact containing each of the essential
elements of the offenses. Plea Tr. at 38. The Court also entered
a consent order of forfeiture. Plea Tr. at 41; see also Cr. Dkt.
216. The Court set February 17, 2012 as the date for sentencing.
Plea Tr. at 40.

**B.**

Handwerker and Schachter began preparing for sentencing, including by engaging experts to advocate a low loss amount to mitigate the severity of the petitioner's conduct. During this period, the relationship between the petitioner and Schachter quickly frayed and splintered. While preparing for sentencing, the petitioner came to the belief that Schachter had given her incorrect legal advice by advising her to plead guilty to charges for which (she believed) the Government could not have proven her guilt at a trial. <u>See</u> Petition at 263; Petition, Ex. 2H; Schachter Aff. ¶ 5; Schachter Aff., Ex. 3.

Around November 31, 2011, the petitioner informed Schachter that she would like to withdraw her guilty plea. Schachter Aff., Ex. 3. Schachter vehemently disagreed with the petitioner's proposal because he did not believe that there was a nonfrivolous basis for withdrawal. Schachter Aff. ¶ 29. In an e-mail to the petitioner dated December 1, 2011, an associate of Schachter at WFG told the petitioner that, "after hundreds of hours sifting through documents and evidence and speaking to you, as well as your statement to us that you were guilty and your statement under oath in Court that you are guilty, we believe that you are guilty." Schachter Aff., Ex. 3. The e-mail informed the petitioner that she should explore her options with Handwerker, and recommended that she focus on sentencing, but

also explained that, if she insisted on filing a motion to withdraw the guilty plea, Schachter would likely have to withdraw as counsel. Schachter Aff., Ex. 3.

The differences between the petitioner and Schachter had indeed become irreconcilable. At a conference on February 2, 2012, Schachter and the petitioner jointly asked this Court to relieve Schachter as counsel. See Cr. Dkt. 244 at 2-3. On February 6, 2012, Schachter was terminated as counsel for the petitioner, and Alice L. Fontier ("Fontier") of the Law Offices of Joshua L. Dratel, P.C., was appointed as replacement counsel pursuant to the CJA. Cr. Dkt. 236. Handwerker continued his representation of the petitioner.

The petitioner continued to raise the issue of withdrawing her guilty plea with Fontier. See Fontier Decl. ¶ 4. Like Schachter, Fontier believed that withdrawal would be frivolous. Fontier Decl. ¶ 4. In e-mail and letter correspondence, Fontier strongly advised the petitioner against withdrawal, informing the petitioner that the evidence in the case was sufficient for a reasonable jury to convict her, and warning that an attempted withdrawal could result in the original terms of the Plea Agreement being imposed on the petitioner, while also exposing the petitioner to far greater liability because the Government would pursue a trial on the other 15 Counts. See Petition, Exs. 2H, 5; Fontier Decl. ¶ 4. Fontier told the petitioner that she

would not make the motion on the petitioner's behalf; however, Fontier informed the petitioner of the petitioner's right to represent herself. Petition, Ex. 5. The petitioner did not move to withdraw the guilty plea.

The Government and the petitioner each submitted extensive sentencing submissions, which included expert reports and documentary evidence. The petitioner's revised sentencing memorandum relied on two expert reports, the "EisnerAmper Report," Cr. Dkt. 284, and the "Vasil Report," Cr. Dkt. 286. See Cr. Dkt. 280 at 31-38, 49. In essence, the EisnerAmper and Vasil Reports argued that the loss amount attributable to the petitioner's conduct was far less even than the $7 million that the petitioner had conceded in the Plea Agreement. The Reports even suggested that the loss amount might be $0, meaning (if true) that there might be no factual basis for the petitioner's guilty plea to Counts I and II. The revised sentencing memorandum also tended to cast the petitioner as the victim in the case while blaming others, such as the trustees of the funds and the petitioner's accountants. The revised sentencing memorandum suggested that the petitioner was actually innocent of the crimes to which she had pleaded guilty because the petitioner was legally entitled to any money that she had received from the funds. Far from underreporting her personal income in her tax returns, the revised sentencing memorandum

argued that the petitioner had actually overreported her income, meaning that she should be entitled to a tax refund. See Cr. Dkt. 280 at 23-31, 38-40.

The Government disagreed with the methodologies and underlying assumptions (and thus the conclusions) of the EisnerAmper and Vasil Reports because both Reports were based on faulty assumptions. Both Reports relied upon statements by the petitioner to the exclusion of other, more credible evidence from the documents and fact witnesses. See, e.g., Cr. Dkt. 277 at 7. For example, both Reports accepted the petitioner's statement that she did not control King Care because the petitioner's elderly parents were listed as the members of the LLC in King Care's operating agreement, see Cr. Dkt. 284 at 4; Cr. Dkt. 286 at 6, even though there was substantial evidence that the petitioner controlled King Care. The EisnerAmper Report indicated that the loss amount with respect to Count I was far less than that asserted by the Government, and might be even less based on the petitioner's statements that adequate documentation justifying all of the allegedly embezzled monies existed (documentation that neither the petitioner nor anyone else could produce or locate). See Cr. Dkt. 277 at 2-3, 11 n.2; Cr. Dkt. 280 at 32-39; Cr. Dkt. 284 at 1-2, 19, 24; Schachter Aff. ¶ 11. However, in her revised sentencing memorandum, the

petitioner accepted a loss amount of slightly more than $7 million. Cr. Dkt. 280 at 38.

Likewise, with respect to Count II, the Vasil Report concluded (among other implausible things) that expenses for grooming the petitioner's pets were properly considered business expenses, rather than personal expenses, and that expenses associated with the petitioner's horses were properly considered deductible business expenses. See, e.g., Cr. Dkt. 277 at 22-24; Cr. Dkt. 277-10 ¶ 14; Cr. Dkt. 286 at 5-6. The Vasil Report also accepted that the petitioner's elderly parents owned the petitioner's horses, and that they were thus responsible for any taxes on those horses, see Cr. Dkt. 286 at 2-3, even though this Court, after a hearing, concluded that the petitioner in fact owned the horses. See King, 2010 WL 4739791, at *4-5. With respect to the owner of the horses, this Court rejected the very argument that the Vasil Report accepted: that an entity purportedly controlled by the petitioner's parents owned the horses, because there was no evidence to support the claim. See id. at *4 & nn. 3-4.

To rebut the petitioner's claims, the Government submitted (among other things) the administrative agreement between King Care and the funds, which was signed by the petitioner on behalf of King Care, see Cr. Dkt. 277-1; affidavits from fund trustees, investigative reports (including notes of investigative

interviews with King Care's employees), and other materials that showed that the petitioner controlled King Care and negated the assertion that the petitioner was entitled to the additional monies that she had received, see Cr. Dkts. 277-2, 277-4-8; King Care invoices to show that the petitioner was overbilling Local 147's funds for work-performed, see Cr. Dkt. 277-9; and a declaration from an Internal Revenue Service Grand Jury Revenue Agent who had reviewed various tax and accounting documents, and concluded that the petitioner had failed to report at least $12 million in personal income during the relevant period, see Cr. Dkt. 277-10 at 1-2.

After several adjournments, the parties appeared before this Court for sentencing on June 21, 2012. This Court noted that it had reviewed the extensive submissions by the petitioner and the Government, as well as victim impact statements. Sent. Tr. at 9-10. The parties agreed that, for purposes of sentencing, this Court could consider $7 million and one cent as the loss amount in the case, and thus defer the resolution of the precise loss amount, because any Guideline Sentence based on losses in excess of $7 million would already be in excess of the maximum term of 96 months' imprisonment that the Court could impose under the violated statutes. Sent. Tr. at 16, 35, 57.

Counsel for the petitioner argued that the petitioner should receive a non-custodial sentence based on her age and

poor health; and the health of her family members; and the theory that others who had not been charged with any crimes, such as the trustees of Local 147's funds, were complicit in the petitioner's embezzlement. Sent. Tr. at 26-27, 29-30, 32. In arguing for a sentence of 96 months' imprisonment, the Government again summarized the evidence against the petitioner, including by cataloguing the petitioner's use of employee retirement funds for personal expenses. Sent. Tr. at 40-48. This Court also heard statements from victims: union workers who had had their retirement savings diminished or completely wiped out as a result of the petitioner's conduct. Sent. Tr. at 49-56.

The petitioner swore that she had reviewed and discussed with her counsel the Pre-Sentence Report (the "PSR"), its recommendation, and its addendum. Sent. Tr. at 33. The petitioner raised several objections to the PSR that sought to absolve or minimize the petitioner's responsibility for the crimes to which she had pleaded guilty. Sent. Tr. at 12-13, 18-23. In particular, this Court overruled objections to the effect that the petitioner had not attempted to disguise the embezzlement; that the petitioner did not have control over King Care; that King Care was legally entitled to any monies received; and that the petitioner did not knowingly pay for personal expenses using money from the retirement funds; but

sustained objections related to the precise loss amount, which had yet to be established. Sent. Tr. at 61-63.

The Government also objected to affording the petitioner any credit for acceptance of responsibility in light of her sentencing submissions, an objection this Court overruled because the petitioner had accepted responsibility at the time of her guilty plea. Sent. Tr. at 35-36, 63-64. The Court noted that whether she had since ceased accepting responsibility was an issue that could be considered in determining an appropriate sentence.

This Court found that there could be no question that the Guideline Sentence was the statutory maximum of 96 months' imprisonment because, under any formulation, the sentence under the Guidelines based on the actual losses was in excess of 96 months' imprisonment. Sent. Tr. at 56-58.

After a careful review of the sentencing submissions, this Court concluded that the EisnerAmper and Vasil Reports were not credible, and found that the petitioner's arguments seeking to minimize her role in the crimes to which she had pleaded guilty were without merit. With respect to Count I, this Court noted that the petitioner had argued in her sentencing submissions, including through the EisnerAmper Report, that she was "guilty of embezzlement only because she caused the benefit funds to pay for expenses that were properly charged to other entities such

as the welfare fund and the union itself and, therefore, charging those expenses to the benefit funds was improper." Sent. Tr. at 59. The petitioner "contend[ed] that she did, in fact, do this work and was compensated appropriately for it although . . . the money should not have come out of the benefit funds[,] [which] was the nature of the embezzlement. She also contend[ed] that some of the money that was paid and otherwise unaccounted for was for past compensation that was deferred and not previously paid." Sent. Tr. at 59-60.

This Court found that the petitioner's arguments were not credible. This Court noted that there was no documentation for any deferred compensation, or "extra" work that the petitioner claimed she was authorized to do, or to explain the low loss amount that the petitioner urged. Sent. Tr. at 60. The Court found more credible the explanation that the petitioner "was able to control the expenditures from the funds; that she caused these expenditures to be paid to King Care[,] which she controlled; and that these expenses were for unjustified expenses; and that she used the accounts of King Care to pay for extravagant personal expenses." Sent. Tr. at 60.

With respect to Count II, this Court noted that the petitioner contended that, "while she subscribed to false tax returns, when additional deductions are counted she, in fact, overpaid her taxes." Sent. Tr. at 62. This Court found the

argument, and the Vasil Report on which the argument was based, unpersuasive because, among other reasons, the petitioner and the Vasil Report had failed to account for millions of dollars in income that the petitioner had admitted to embezzling. Sent. Tr. at 62.

With respect to both Counts, this Court noted that the petitioner's post-guilty plea arguments had contradicted her sworn statements under oath during the plea allocution, which this Court credited. Sent. Tr. at 60-62.

This Court determined the appropriate sentence for the petitioner in light of the factors set forth in 18 U.S.C. § 3553(a). Sent. Tr. at 64-67. Among other findings, this Court found that the petitioner had failed to accept responsibility or express remorse for her actions, noting that she had instead sought to blame numerous other parties, such as fund trustees, other professionals, and her former husband. Sent. Tr. at 65. On the other hand, this Court found that there were significant mitigating factors in the case, most importantly related to the petitioner's health. Sent. Tr. at 66.

Accordingly, this Court varied downwardly and imposed a sentence of a term of 72 months' imprisonment --- 60 months on Count I and 36 months on Count II, with twelve months on Count II to run consecutively, and 24 months to run concurrently, to the sentence on Count I --- to be followed by 36 months of

supervised release. Sent. Tr. at 67, 71. The Court also imposed a $200 mandatory special assessment and entered an Order of Forfeiture as to specific property, while allowing the amount of the money judgment of forfeiture, and the amount of restitution, to be determined at a later time. Sent. Tr. at 68, 71, 74.

The Court confirmed that the petitioner understood that she had waived her right to appeal the sentence as part of the Plea Agreement. Sent. Tr. at 75. The Court nonetheless advised the petitioner that a notice of appeal must be filed within ten days after the entry of the judgment of conviction.[3] Sent. Tr. at 75.

The judgment of conviction was signed on July 18, 2012, and entered on the docket on July 25, 2012. See Cr. Dkt. 296. The parties thereafter stipulated to a loss amount of $21 million. Cr. Dkts. 305-08. A final forfeiture order was filed on March

---

[3] Although the petitioner does not raise the issue, the deadline for filing the notice of appeal was actually 14 days after the entry of the judgment at the time of the petitioner's sentence in 2012. See Amendment to Fed. R. App. P. 4(b)(1)(A) (effective December 1, 2009) (changing the deadline to file a notice of appeal from 10 days to 14 days). The difference is harmless in this case. See Notes of Advisory Committee on the 2009 Amendments, Note to Fed. R. App. P. 26(b)(1)(A) (noting that the 2009 amendments to the time computation rules were usually irrelevant to most cases: "a 10-day period and a 14-day period that started on the same day usually ended on the same day" because, before the 2009 amendments, Saturdays and Sundays were not counted for periods of less than 11 days). The petitioner never attempted to file a notice of appeal. Moreover, as addressed below, the petitioner waived any challenges to her sentence, and there is no basis to conclude that any purported ineffective assistance of counsel with respect to her attorneys' advice on her ability to file an appeal prevented her from timely filing an appeal within the applicable time period.

14, 2013, and an amended judgment, specifying $21 million in restitution owed, was entered on the docket on March 28, 2013. Cr. Dkts. 326, 328.

The petitioner did not file a direct appeal.

## C.

On June 20, 2013, and June 22, 2013, respectively, this Court received two letters from the petitioner's daughter (the "June 2013 Letters") requesting that the Court vacate the judgment of conviction against the petitioner, or, in the alternative, appoint counsel to aid the petitioner in "present[ing] the following information in a formal motion."[4] See Cr. Dkt. 330. The 31-page June 2013 Letters, along with the attached exhibits, raised two purported claims on behalf of the petitioner: (1) ineffective assistance of counsel based primarily on Schachter's advice to plead guilty, and the refusal by Schachter and later Fontier to withdraw the guilty plea; and (2) prosecutorial misconduct based primarily on the Government's prosecution of the petitioner for crimes that she did not commit. Cr. Dkt. 330

By Order dated June 27, 2013, this Court found that the June 2013 Letters did not constitute a basis for the petitioner to seek habeas relief pursuant to 28 U.S.C. § 2255 because they

---

[4] One copy of the June 22, 2013 letter included a bulky set of exhibits. See Cr. Dkt. 329.

were jurisdictionally defective. <u>See</u> Cr. Dkt. 329. Specifically, the petitioner's daughter had "no right to represent [the petitioner] or to seek relief on [the petitioner's] behalf" because a "petition to vacate a conviction must be brought by the defendant or an attorney for the defendant." Cr. Dkt. 329. As this Court noted, a "next friend" could have brought "such an application only if there [wa]s an adequate explanation," but the June 2013 Letters offered "no adequate explanation why the [the petitioner] [could not] bring her own petition." Cr. Dkt. 329.

On July 22, 2013, this Court received another letter from the petitioner's daughter (the "July 2013 Letter") "with a purported unsigned memo from [the petitioner] . . . seeking the appointment of counsel for [the petitioner] and an extension of time to file a section 2255 motion." Cr. Dkt. 332. By Order dated July 24, 2013, this Court denied the request for the appointment of counsel without prejudice because there had been "no showing at this point that the defendant ha[d] any meritorious claim." Cr. Dkt. 332.

In response to the request by the petitioner's daughter, this Court extended the time to file a petition pursuant to 28 U.S.C. § 2255 to September 20, 2013 "[t]o the extent that the Court ha[d] jurisdiction" to do so. Cr. Dkt. 331. In fact, the Court did not have jurisdiction to extend the petitioner's time

to file a § 2255 petition. <u>See</u> <u>Green v. United States</u>, 260 F.3d 78, 82 (2d Cir. 2001) ("[A] district court may grant an extension of time to file a motion pursuant to section 2255 only if . . . the moving party requests the extension upon or after filing an actual section 2255 motion . . . ."); <u>Barton-Nachamie v. United States</u>, No. 04 CIV. 5764(SAS), 2005 WL 356811, at *1 n.1 (S.D.N.Y. Feb. 15, 2005). In any event, as noted below, the Court never purported to extend the time for the petitioner to file a petition (even if the Court had jurisdiction to do so) beyond October 25, 2013, and the petitioner did not file her Petition until September 2014, almost a year later.

On or around September 16, 2013, this Court received a letter from the petitioner dated September 9, 2013 (the "September 2013 Letter"), along with separately filed exhibits. <u>See</u> Cr. Dkt. 336. The September 2013 Letter stated that the petitioner's guilty plea was not knowing and voluntary, that the Government was responsible for prosecutorial misconduct, and that the petitioner's sentence was a cruel and unusual punishment. Cr. Dkt. 336. The 21-page September 2013 Letter stated: "I am asking the Court to take this letter and vacate the judgment of conviction, and dismiss this case, as it is clear that this case never should have been brought . . . ." Cr. Dkt. 336 at 23.

The September 2013 Letter specified that it was not a formal motion. The September 2013 Letter stated that the petitioner was "very concerned about filing the motion without an attorney," and thus requested the appointment of "an attorney [to] help [the petitioner] put together all of the relevant information to file a formal petition," as well as the opportunity to present evidence. Cr. Dkt. 336 at 23-24.

By Order dated September 17, 2013, this Court denied the petitioner's request for the appointment of counsel because the petitioner had not made a sufficient showing that an appointment was warranted. Cr. Dkt. 336 at 1-2. This Court also noted that, "It [was] plain that the present submission [was] not a motion pursuant to 28 U.S.C. § 2255. Indeed, the [petitioner] affirmatively state[d] that she [was] reluctant to file such a motion. However, the Court would not vacate a conviction based on a letter." Cr. Dkt. 336 at 2. This Court nonetheless extended the time to file a petition pursuant to 28 U.S.C. § 2255 to October 25, 2013, "[t]o the extent that [it] [had] jurisdiction to do so." Cr. Dkt. 336 at 3.

The petitioner submitted the current Petition approximately one year later, on or around September 24, 2014.[5] Fairly read,

---

[5] "Under the prison mailbox rule, 'a *pro se* prisoner's habeas petition is deemed filed at the moment he gives it to prison officials.'" Khawar v. United States, No. 10-CR-01082, 2016 WL 6270732, at *3 (S.D.N.Y. Oct. 26, 2016) (citation omitted). The

the sprawling 290-page Petition alleges: (1) that the guilty plea was not knowing, intelligent, or voluntary, in particular because the petitioner had a "compromised" medical condition; (2) ineffective assistance of counsel related to advice that led the petitioner to plead guilty, and counsel's later failure to file a motion to withdraw the guilty plea; (3) prosecutorial misconduct, including the Government's alleged interference with the petitioner's choice of counsel, and failure to investigate the case (which would have informed the Government that the petitioner was actually innocent); (4) actual innocence; and (5) that the petitioner's sentence violated the Cruel and Unusual Punishments Clause of the Eighth Amendment because she is actually innocent.

## II.

### A.

The Petition must be dismissed because it is untimely. The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on an application for

---

petitioner asserts that she filed the Petition on or around September 24, 2014. Petitioner's Reply at 5. The docket reflects that the Petition was filed on ECF on September 30, 2014, which the Government argues was the date of filing. Gov. Br. at 13. While the record is otherwise unclear as to when the petitioner gave the prison officials the Petition, the Government offers no basis to dispute the petitioner's version of events, which the Court credits. See Khawar, 2016 WL 6270732, at *3. The six-day delay between giving the Petition to the prison officials and the Petition's entry on the docket is plausible.

a writ of habeas corpus under Section 2255. 28 U.S.C. § 2255(f).

The limitations period for such a claim begins to run from the

date on which the judgment of conviction becomes final. Because

the petitioner did not file a direct appeal, the judgment of

conviction in this case became final fourteen days after its

entry on July 25, 2012.[6] See Fed. R. App. P. 4(b)(1)(A). The

petitioner filed the Petition on or about September 24, 2014,

over one year after the applicable one-year limitations period

had ended.[7] See 28 U.S.C. § 2255(f). Therefore, the Petition is

time-barred under Section 2255.

---

[6] The Government contends that the statute of limitations began running 14 days after July 19, 2012, the day the physical judgment was stamped "filed." Cr. Dkt. 296. However, the docket reflects that the judgment was "entered" on the docket on July 25, 2012. The statute of limitations thus began running 14 days after the latter date. See Houston v. Greiner, 174 F.3d 287, 288 (2d Cir. 1999) ("'Entry of judgment,' . . . is the act of recording in a docket maintained by the clerk of a court the fact that a judgment has been rendered."); Salas v. United States, No. 14-CV-1915 (SLT), 2015 WL 260574, at *1 (E.D.N.Y. Jan. 20, 2015) ("A judgment or order is 'entered' under [Federal Rule of Appellate Procedure 4(b)(1)(A)(i)] when it is entered on the docket." (citing Fed. R. App. P. 4(b)(6)).

[7] While neither the petitioner nor the Government raises this issue, it is possible that the statute of limitations to file a § 2255 motion should be deemed to run from 14 days after the date of the amended judgment, which included the restitution amount and which was entered on the docket on March 28, 2013. The Court of Appeals has not addressed this precise issue. In Kaminski v. United States, 339 F.3d 84, 87 (2d Cir. 2003), the Court of Appeals left open the possibility that an order of restitution could be sufficiently custodial in nature to be collaterally challengeable. And in Gonzalez v. United States, 792 F.3d 232 (2d Cir. 2015) (per curiam), the Court of Appeals held that, when an appellate court affirms an order of conviction but remands to the trial court for recalculation of

The petitioner argues that that the documents that she and

her daughter sent to the Court before September 24, 2014,

somehow tolled the statute of limitations, but the argument is

without merit. See Sanchez-Butriago v. United States, Nos.

00Civ8820 (JFK) & 89cr644-2 (JFK), 2003 WL 354977, at *3

(S.D.N.Y. Feb. 14, 2003) ("The limitation period is not tolled

whenever a petitioner files any sort of motion. Were it tolled

so easily, a petitioner could repeatedly file motions, ones with

little to no chance of success, and effectively eviscerate

AEDPA's statute of limitations."); Csanadi v. United States, No.

---

restitution, "the limitations period [for AEDPA purposes] begins
to run only when the revised restitution order becomes final."
Id. at 233. In such circumstances, there are two different time-
bars for AEDPA purposes: one from when the original judgment is
entered, and one from when the amended judgment is entered. Id.
at 238. Otherwise, "situations could arise where defendants
could not collaterally attack an order of restitution that
severely restrained their liberty." Id. It is possible to
interpret these cases as standing for the proposition that an
amended judgment that contains a substantially changed
restitution order starts the time clock anew for AEDPA purposes.
     The petitioner does not raise any direct challenges against
the restitution order beyond the general challenges to her
sentence. Ultimately, however, a later deadline measured from 14
days after March 28, 2013 would not aid the petitioner. The
Petition would still be untimely by approximately six months.
Accordingly, it is unnecessary to decide whether the AEDPA
statute of limitations began to run anew 14 days after the date
the amended judgment with the final restitution order was
entered. See Castilo v. United States, No. 13 CIV. 4298
(PGG)(JLC), 2012 WL 9500631, at *3 n.10 (S.D.N.Y. Nov. 12, 2012)
("[B]ecause [the] petition is time-barred under either scenario,
it is of no consequence whether his amended judgment altered the
date his conviction became final."), report and recommendation
adopted, No. 13CIV4298 (PGG)(JLC), 2016 WL 1610609 (S.D.N.Y.
Apr. 20, 2016). Moreover, as explained below, the petitioner's
claims are without merit regardless of the time-bar.

3:15CV1459 (JBA), 2016 WL 2588162, at *6-7 (D. Conn. May 4, 2016) (finding that motions seeking the appointment of counsel and an extension of time do not toll the statute of limitations). For the reasons discussed in this Court's Orders, see Cr. Dkts. 329, 332, 336, these submissions did not constitute "bare-bones" petitions filed within the time limitation that could later be fleshed out through amendment. See Csanadi, 2016 WL 2588162, at *6-7.

The June 2013 Letters from the petitioner's daughter were properly rejected because they were jurisdictionally defective. See Cr. Dkt. 329 (citing Ross ex rel. Dunham v. Lantz, 408 F.3d 121, 123 (2d Cir. 2005) (per curiam)). The Supreme Court has established two requirements that must be met in order to qualify for "next friend" standing: first, a next friend must "provide an adequate explanation, such as inaccessibility, mental incompetence or other disability-why the real party in interest cannot appear on his own behalf to prosecute the action," and second, the next friend must be "truly dedicated to the best interests of the person on whose behalf he seeks to litigate." Whitmore v. Arkansas, 495 U.S. 149, 163-64 (1990); see also Ross ex rel. Dunham, 408 F.3d at 123; Smith v. Conway, No. 07 CIV.7174 (JGK), 2008 WL 2531194, at *3 (S.D.N.Y. June 24, 2008).

The June 2013 Letters contained "no adequate explanation why the defendant [could] not bring her own petition." Cr. Dkt. 329; see also Smith, 2008 WL 2531194, at *4 (explanation that filing a petition was "impossibly hard" for the convict was inadequate); Clark v. Burge, No. 06CV658, 2007 WL 1199475, at *2 (W.D.N.Y. Apr. 19, 2007) ("Courts have held that a father lacked standing in his son's habeas proceeding where there was no finding that the son was unable to prosecute that action." (citations omitted)). The fact that the petitioner submitted the September 2013 Letter to this Court three months later --- as well as the current Petition --- belies the claim that the petitioner was incapable of prosecuting this action. Moreover, in asking for the appointment of counsel, the petitioner's daughter explicitly disclaimed that the September 2013 Letter was a "formal motion" because the petitioner's daughter did "not want to cause further harm to [the petitioner]," Cr. Dkt. 330 at 1, which reflected an apparent desire to avoid filing a petition pursuant to 28 U.S.C. § 2255 without the assistance of an attorney. In her own September 2013 Letter, the petitioner expressed her own concern "about filing the motion without an attorney." Dkt. 336 at 23-24.

Indeed, the remaining 2013 submissions could not be construed as habeas petitions. These submissions each requested relief other than habeas relief (for example, an extension of

time to seek such relief, the appointment of counsel, and the opportunity to present evidence). Moreover, the July 2013 Letter was submitted by the petitioner's daughter, who did not have standing to seek relief on behalf of the petitioner. Likewise, the September 2013 Letter submitted by the petitioner explicitly disclaimed that it was seeking habeas relief.

Accordingly, none of the 2013 submissions can be considered petitions under 28 U.S.C. § 2255, nor did they toll the statute of limitations.

The petitioner also argues for equitable tolling. A court may consider an otherwise time-barred petition under the doctrine of equitable tolling, but only in "rare and exceptional circumstance[s]." Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam); see also Carbone v. Cunningham, No. 06 Civ. 5710 (JGK), 2007 WL 4205821, at *2 (S.D.N.Y. Nov. 28, 2007). To qualify for equitable tolling, the petitioner must establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005). To show that extraordinary circumstances "prevented" timely filing, the petitioner must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable

diligence, could have filed on time notwithstanding the extraordinary circumstances." Hizbullahankhamon v. Walker, 255 F.3d 65, 75 (2d Cir. 2001) (quoting Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000)). The Supreme Court recently reaffirmed that the extraordinary circumstances "prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." Menominee Indian Tribe of Wis. v. United States, 136 S. Ct. 750, 756 & n.2 (2016); see also Bolarinwa v. Williams, 593 F.3d 226, 231–32 (2d Cir. 2010) (mental illness constituted extraordinary circumstances); Baldayaque v. United States, 338 F.3d 145, 152–53 (2d Cir. 2003) ("sufficiently egregious" attorney conduct); Valverde, 224 F.3d at 133–34 (prison officials intentionally preventing the petitioner from filing a petition). Where extraordinary circumstances exist, the petitioner still must "establish that he acted diligently . . . throughout the time he seeks to have tolled" for the doctrine of equitable tolling to apply. Rivas v. Fischer, 687 F.3d 514, 539 (2d Cir. 2012); see also Atkins v. Gonyea, No. 12 CIV. 9186 (JGK), 2014 WL 199513, at *2 (S.D.N.Y. Jan. 17, 2014).

The petitioner has failed to meet either prong of the equitable tolling test. It is plain that the petitioner was capable of filing a petition before the statutory time-bar in

the same way that she filed the current Petition, only substantially late.

There are no extraordinary circumstances in this case. Any possible mistake in the law that led the petitioner's daughter to submit the jurisdictionally defective June 2013 Letters is not extraordinary; "a pro se petitioner's ignorance of the law" is "insufficient to create the extraordinary circumstances required for equitable tolling of AEDPA." Carbone, 2007 WL 4205821, at *3 (collecting cases). Filing a jurisdictionally compliant petition was well-within the petitioner's control. Moreover, none of the 2013 submissions purported to be § 2255 motions.

The petitioner indicates that she sent her daughter documents that the petitioner otherwise needed to draft a petition herself, which lengthened the drafting process. This was a self-created obstacle, and the decision to send the documents to her daughter was not outside of the petitioner's control, nor did it bar the petitioner from submitting a bare-bones petition. See Smith, 2008 WL 2531194, at *4. Furthermore, the purported unavailability of the documents did not prevent the petitioner from sending the September 2013 Letter to the Court, along with exhibits. See id.

The petitioner points to a number of medical conditions that she claims prevented her from timely filing the Petition,

but the standard for extraordinary circumstances is whether those conditions prevented the petitioner from filing the Petition within the statutory time period. The petitioner does nothing to establish that any conditions prevented her from filing the Petition in a timely fashion. See Jones v. Walsh, No. 06 CIV. 225 (JGK), 2007 WL 4563443, at *4 (S.D.N.Y. Dec. 27, 2007) (collecting cases); Thomas v. Unger, No. 06CV6578 (NG), 2007 WL 539039, at *2-3 (E.D.N.Y. Feb. 15, 2007).

In addition, the petitioner has failed to demonstrate that she acted with due diligence. On two occasions, this Court extended the deadline for the petitioner to file a petition to the extent it had jurisdiction. While the Court lacked jurisdiction to do so, see Green, 260 F.3d at 82, those deadlines nevertheless served as warnings to the petitioner to file a petition no later than October 25, 2013 to at least meet the due diligence prong of the equitable tolling test.

The petitioner ignored those deadlines (and, more significantly, the statutory deadline). She finally filed the Petition in September 2014, well after AEDPA's deadline had run under any test. The Petition did not simply cure minor procedural defects in the prior submissions, but instead added myriad new allegations. The petitioner's conduct does not evidence due diligence. See Mears v. Graham, No. 13-CV-8737

(AJN), 2014 WL 4060022, at *12 (S.D.N.Y. Aug. 14, 2014);

Csanadi, 2016 WL 2588162, at *6-7.

The petitioner cites Socha v. Boughton, 763 F.3d 674 (7th

Cir. 2014), but that case is not on point. In that case, the

petitioner faced "nearly insurmountable" barriers to filing his

petition by the statutory deadline because the petitioner's

attorney on direct appeal ignored the petitioner's repeated

requests to turn over the petitioner's legal file. Id. at 686.

In this case, the petitioner faced nothing resembling

insurmountable barriers to filing her Petition.[8] See also

Carpenter v. Douma, 840 F.3d 867, 873 (7th Cir. 2016)

(distinguishing Socha).

Finally, the petitioner cannot rely on Section 2255(f)(4),

which provides that the one-year limitations period shall run

from "the date on which the facts supporting the claim or claims

presented could have been discovered through the exercise of due

diligence." 28 U.S.C. § 2255(f)(4). Any challenge to the

effectiveness of the petitioner's defense counsel could have

been raised at any time after the plea allocution. See Chowdhary

v. United States, No. 11 CR. 859 (JGK), 2015 WL 273728, at *5

---

[8] The equitable tolling analysis would be no different if the
time-bar began running from 14 days after the date of the
amended judgment. The Petition would still be about six months
late, and there is no evidence of due diligence or extraordinary
circumstances during that six month period.

(S.D.N.Y. Jan. 22, 2015), <u>reconsideration denied</u>, No. 11 CR. 859
(JGK), 2015 WL 1065063 (S.D.N.Y. Mar. 10, 2015).

Accordingly, the Petition under 28 U.S.C. § 2255 is time-
barred.

**B.**

The petitioner argues that she is actually innocent of the
crimes to which she pleaded guilty. In exceptional cases, the
actual innocence doctrine provides petitioners a gateway to
present an otherwise untimely habeas petition. See <u>McQuiggin v.
Perkins</u>, 133 S. Ct. 1924, 1932 (2013); <u>see also</u> <u>Williams v.
Racette</u>, No. 13 CV. 7779 (JGK), 2014 WL 5285472, at *4 (S.D.N.Y.
Oct. 15, 2014). "It is the combination of the two claims—that
the petitioner is likely innocent and that his conviction was
likely the result of nonharmless constitutional error-that
permits a habeas court to review the petition notwithstanding
procedural obstacles in order to avoid a miscarriage of
justice." <u>Rivas</u>, 687 F.3d at 540–41; <u>see also</u> <u>Anderson v. United
States</u>, 612 F. App'x 45, 46 n.1 (2d Cir. 2015) (summary order)
(noting that the reasoning of <u>McQuiggin</u> and <u>Rivas</u> applies in the
28 U.S.C. § 2255 context).

"To establish actual innocence, [the] petitioner must
demonstrate that, in light of all the evidence, it is more
likely than not that no reasonable juror would have convicted
him." <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998)

(citations and internal quotation marks omitted); see also
Rivas, 687 F.3d at 539–41 (noting that the evidence must
constitute "new reliable evidence . . . that was not presented
at trial" (citation and internal quotation marks omitted));
Freeman v. United States, Nos. 09 Civ. 4087, 02 Cr. 150, 2010 WL
4026067, at *2 (S.D.N.Y. Oct. 14, 2010). "'[A]ctual innocence'
means factual innocence, not mere legal insufficiency." Bousley,
523 U.S. at 623; see, e.g., Rosario v. United States, 164 F.3d
729, 733 (2d Cir. 1998). This is a "demanding" standard "and
permits review only in the extraordinary case." House v. Bell,
547 U.S. 518, 538 (2006) (citation and internal quotation marks
omitted); see also Garafola v. United States, 909 F. Supp. 2d
313, 326 (S.D.N.Y. 2012).

This is not an exceptional case, and the petitioner's claim
that she is actually innocent is neither credible nor
compelling. See Qadar v. United States, No. 13-CV-2967 (ARR),
2014 WL 3921360, at *7 (E.D.N.Y. Aug. 11, 2014). A review of the
record makes clear that the claim is without merit.

The petitioner's detailed sworn testimony in support of her
guilty plea to Counts I and II is sufficient to reject the
petitioner's claim of actual innocence. See Puglisi v. United
States, 586 F.3d 209, 214 (2d Cir. 2009) (observing that "a
district court need not assume the credibility of factual
assertions . . . where the assertions are contradicted by the

record in the underlying proceeding" and collecting cases).

Beyond the guilty plea, the extensive evidence submitted in

connection with sentencing negates the petitioner's claim of

actual innocence. There is more than a reasonable likelihood

that a jury would have found the petitioner guilty beyond a

reasonable doubt of both Count I and Count II had the case

proceeded to a trial.

The petitioner points to the EisnerAmper and Vasil Reports.

She argues that she did not control King Care, that she was owed

deferred compensation for her work with Local 147's funds, that

any expenses were justified, that the loss amount was $0, and

that other individuals were complicit in any embezzlement. This

Court already rejected these arguments, as well as the

credibility of the EisnerAmper and Vasil Reports, at sentencing.

See Castilo v. United States, No. 13CIV4298 (PGG), 2016 WL

1610609, at *3 (S.D.N.Y. Apr. 20, 2016) ("[The petitioner] has

not offered any new evidence that casts doubt on the factual

allocution he gave at the time of his guilty plea.").

The petitioner insists that she could have established that

she was not a fiduciary of Local 147's funds, which she argues

would have negated an element of Count I. The Court already

rejected that argument as meritless in denying a motion to

dismiss Count I filed by her attorneys in the underlying

proceedings. See King, 2011 WL 1630676, at *2. Nothing that the

petitioner has submitted changes the conclusion that there was a

sufficient factual predicate to support her conviction in this

case. Indeed, in correspondence with her attorneys prior to the

guilty plea, the petitioner admitted her guilt, although she

challenged the magnitude of the loss amount attributable to her

conduct, just as she did during the plea allocution. See

Schachter Aff., Ex. 2 (October 19, 2011 e-mail from the

petitioner to Schachter stating: "I need to be able to accept

responsibility for what I did not an open ended millions of

dollars"). Despite the Petition's rhetoric, the petitioner's

choices not to move to withdraw her guilty plea even after being

explicitly informed of her right to represent herself, and to

agree to a $21 million loss amount instead of challenging the

loss amount at a Fatico hearing, further support the veracity of

her guilty plea. See Gilliam v. Superintendent, No. 9:13-CV-

0788, 2015 WL 114344, at *11 (N.D.N.Y. Jan. 8, 2015).

The petitioner raises several self-serving arguments in an

effort to cast doubt on the probative value of her sworn

admissions of guilt. Regardless of any challenge to the guilty

plea, there was plainly sufficient evidence beyond the guilty

plea to convict the petitioner. Moreover, these arguments

implicate claims that attack the process that led to the guilty

plea, which are distinct from the claim for actual innocence.

These claims are untimely, and moreover, procedurally barred

because they were not raised in a direct appeal or through a motion to withdraw the guilty plea. See Morales v. United States, No. 04 CR 290 (SAS), 2008 WL 4761705, at *5 (S.D.N.Y. Oct. 29, 2008) (citing United States v. Munoz, 143 F.3d 632, 637 (2d Cir. 1998)).

Nevertheless, the petitioner has raised these claims in an effort to show that she was actually innocent, and they will be addressed here. The claims are meritless. The Court of Appeals has advised that "sworn testimony given during a plea colloquy 'carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made.'" United States v. Rivernider, 828 F.3d 91, 105 (2d Cir. 2016) (quoting United States v. Juncal, 245 F.3d 166, 171 (2d Cir. 2001)). The petitioner has not offered any substantial reason to doubt her sworn testimony at her guilty plea.

The petitioner argues that her medical condition prevented her from giving an intelligent and knowing guilty plea. This Court asked multiple questions of the petitioner at different points in the plea allocution --- including regarding her mental status, her medical condition, and any medical treatments --- to ascertain that she was competent to plead guilty. The

petitioner, and her counsel, repeatedly assured this Court that she was competent to do so.[9] "Nothing more was required, and the questions and answers, as well as the overall record of the plea colloquy, amply support the . . . conclusion that the plea was entered knowingly and voluntarily." United States v. Pattee, 820 F.3d 496, 508 (2d Cir. 2016) (rejecting argument that a recent suicide attempt undercut a guilty plea). This Court's observations of the petitioner, and the content of her sworn testimony --- including her clarification that she was not stipulating to a loss amount of $40 million --- establish that no medical condition prevented the petitioner from giving a knowing and intelligent guilty plea. See Morales, 2008 WL 4761705, at *5.[10]

---

[9] Schachter swears: "Ms. King claims that I permitted her to plead guilty despite her being physically ill and incompetent to do so. In my interactions with Ms. King, I had no reason to believe that she was not competent to accept the plea agreement and plead guilty. Nor did Ms. King ever express such a sentiment to me. Ms. King testified herself under oath at the plea hearing that there was nothing, including her health, preventing her from being competent to enter a guilty plea. Additionally, I was in contact with Ms. King's physician, Dr. Tindel, in connection with efforts to postpone Ms. King's court appearances in light of her health. Dr. Tindel provided his assessment of Ms. King's medical condition and never indicated that he believed her medical condition or medication was interfering with her competency." Schachter Aff. ¶ 28

[10] The petitioner claims that she had in fact taken pain medication the day before the plea allocution, and that therefore her sworn testimony at the plea allocution (which took place in the afternoon) that she had not taken any pain medication in the last 24 hours was not accurate. But there is no evidence that any pain medication taken the day before the

The petitioner also argues that her attorneys coerced her into agreeing to plead guilty. The petitioner's claim is refuted by her repeated statements at the plea allocution that her plea was voluntary. See, e.g., Garcia-Giraldo v. United States, 691 F. Supp. 2d 500, 512 (S.D.N.Y. 2010); Kellam v. Hunt, No. 06 CIV 4395 (JGK), 2007 WL 2005544, at *4 n.2 (S.D.N.Y. July 10, 2007). This Court informed the petitioner several times that she was free to end the plea allocution at any time. The petitioner voluntarily chose to plead guilty, and expressed her satisfaction with her attorneys under oath. A review of the correspondence between the petitioner and her counsel submitted with the Petition, along with the Attorney Affidavits, reveal no coercion. See Schachter Aff., ¶¶ 23-25. It is plain that, "The ultimate choices were appropriately the petitioner's, but they were freely and voluntarily made after thorough and considered advice by [her] trial counsel." Garcia-Giraldo, 691 F. Supp. 2d at 512.

The petitioner further contends that her guilty plea was the product of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must show both that: (1) her counsel's performance was deficient in

---

plea allocution interfered with the knowing and voluntary nature of the petitioner's plea the following afternoon. The petitioner is a highly educated woman who affirmed that her mind was clear at the time of the plea. Plea Tr. at 12.

that it was objectively unreasonable under professional
standards prevailing at the time, and (2) that her counsel's
deficient performance was prejudicial to her case. See
Strickland v. Washington, 466 U.S. 668, 687 (1984); Bunkley v.
Meachum, 68 F.3d 1518, 1521 (2d Cir. 1995); see also Diaz v.
United States, No. 11-CR-474 (JGK), 2016 WL 205432, at *5
(S.D.N.Y. Jan. 15, 2016).

The petitioner cannot meet the first prong of this test
merely by showing that her counsel employed poor strategy or
made a wrong decision. Instead, the petitioner must show that
"counsel made errors so serious that counsel was not functioning
as the 'counsel' guaranteed . . . by the Sixth Amendment."
Strickland, 466 U.S. at 687. In fact, there is a "strong
presumption" that defense counsel's performance fell within the
wide range of reasonable professional assistance, and "the
defendant bears the burden of proving that counsel's
representation was unreasonable under prevailing professional
norms and that the challenged action was not sound strategy."
Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (citing
Strickland, 466 U.S. at 688–89). To meet the second prong of the
Strickland test, the petitioner must show that "there is a
reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different.
A reasonable probability is a probability sufficient to

undermine confidence in the outcome." Strickland, 466 U.S. at 694. Where a petitioner challenges a guilty plea on the basis of alleged ineffective assistance of counsel, "the [petitioner] must show that 'there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial.'" United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001) (per curiam) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)); see also Ottenwarde v. United States, No. 12-cv-6537 (JGK), 2013 WL 1242632, at *6-7 (S.D.N.Y. Mar. 28, 2013); Diaz, 2016 WL 205432, at *5.

The petitioner argues that the evidence could not support a conviction, and that her lawyers gave her bad advice by advising her to plead guilty. The argument is without merit. There was an ample factual predicate for the petitioner's guilty plea. See Diaz, 2016 WL 205432, at *5.

The petitioner contends that, at sentencing, this Court discredited Schachter's legal advice that there was a sufficient factual predicate for her guilty plea, but this Court did nothing of the sort. The petitioner argues that she received erroneous legal advice from Schachter to the effect that if she did work for Local 147, but charged the funds for that work, that would still be embezzlement from the funds. She claims that the Court rejected that theory at sentencing. The Court in fact

did not reject such a theory, but rather found that what the petitioner did was much worse --- she charged the funds for work that was not done, and used the funds for extravagant personal expenses. That was in fact what the petitioner admitted under oath to doing.

A review of the record establishes that there was no ineffective assistance of counsel that led the petitioner to plead guilty. See Oklu v. United States, No. 12CR177 (WHP), 2016 WL 1383530, at *3 (S.D.N.Y. Apr. 7, 2016). The guilty plea was a calculated choice by the petitioner: the petitioner was facing the prospect of a trial on a 17-count indictment that exposed the petitioner to a potential term of imprisonment that, given her age, would have effectively functioned as a life sentence. The advice to plead guilty represented a strategic choice to reduce the petitioner's potential exposure in light of the copious amount of evidence against her to a maximum of 96 months' imprisonment, which was in fact less than the Sentencing Guidelines would have provided had it not been for the statutory maximum limiting the sentence. See Petition, Exs. 2A, 2B, 2D; Schachter Aff. ¶¶ 12-18; Schachter Aff., Ex. 2. There is no showing that the advice was objectively unreasonable or that the petitioner would have been willing to face the possible consequences of a guilty verdict on 17 counts at a trial. See Morales, 2008 WL 4761705, at *5.

Finally, the petitioner argues that the "poor" advice to plead guilty resulted from the failure by her attorneys to investigate her case. The duty to investigate "requires counsel to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Greiner v. Wells, 417 F.3d 305, 320-21 (2d Cir. 2005) (citation and internal quotation marks omitted). "It does not, however, compel defense counsel to investigate comprehensively every lead or possible defense." Id. at 321.

There is no basis for the petitioner's claim. The petitioner faults her counsel for not engaging an ERISA expert, and for purportedly failing to locate certain documents or interview several witnesses that the petitioner claims would have exonerated her. The allegations are conclusory and, moreover, contradicted by the record. See, e.g., Schachter Aff. ¶ 22. Schachter swears that he and six litigation associates at WFG "devoted over 2,200 hours of work to [the petitioner's] case in a span of less than one year" during which time they reviewed "thousands of documents" and thoroughly researched the relevant legal issues in the petitioner's case. Schachter Aff. ¶¶ 4, 9, 20. WFG engaged outside forensic accountants and investigators, and incurred approximately $30,000 in costs in prosecuting the case. Schachter Aff. ¶¶ 9-10, 20-21; see also Handwerker Decl. ¶¶ 3, 5. These averments are consistent with the conduct of the

petitioner's attorneys in the underlying proceedings, where they ultimately negotiated a favorable guilty plea for the petitioner given the circumstances. See Oklu, 2016 WL 1383530, at *2 (the "Petition fails to overcome the 'strong presumption' that counsel exercised reasonable judgment in his investigation of [the petitioner's] case").

The petitioner's team of attorneys cannot be faulted for failing to locate documentation that did not exist. Schachter swears that:

> [WFG's] investigation and the work of the forensic accountants was hampered by severely deficient and/or non-existent King Care records. The King Care records failed to show what services were provided by King Care to the Benefits Funds, how those services were valued, and how those services related to the payments received by King Care. [The petitioner] was responsible for maintaining those records and repeatedly insisted that they existed and that they would explain and justify the payments from the Benefits Funds. Despite multiple requests by us, however, [the petitioner] failed to identify documentation supporting the full amounts paid from the Benefit Funds to King Care. WFG's own independent review was also unable to identify any King Care records that substantiated [the petitioner's] claims or that would provide her with a defense.

Schachter Aff. ¶ 11. Likewise, the decision to not engage an ERISA expert was a considered strategic choice. See Petition, Ex. 2B (E-mail from Schachter to the petitioner dated October 5, 2011 stating: "Imagine what an expert would say about using fund assets for union expenses or taking fees with no invoices and no records [that] show exactly what is owed. It seems to me that

any expert in the duties of a fund administrator would convict you through his testimony."). It is apparent that the petitioner's attorneys worked zealously on her behalf.

Indeed, when asked at the plea allocution whether she was satisfied with Schachter and his representation, the petitioner responded: "Yes, very much so." Plea Tr. at 14. And, in addition to Schachter, the petitioner was represented throughout the proceedings by Handwerker, whom the petitioner never sought to discharge.

Therefore, the Petition is time-barred, and there is no exception or tolling provision that applies in this case. The petitioner has no plausible argument of actual innocence to provide a basis to consider her Petition.

### III.

While it is unnecessary to discuss any of the remaining claims in the Petition because they are time-barred, the claims will be addressed for the purposes of completeness.

### A.

The petitioner's arguments challenging her guilty plea based on her medical condition, coercion, counsel's advice to plead guilty, and the purported failure to investigate have already been addressed. None of these arguments have merit. The record discloses that the plea was knowing and voluntary.

The petitioner also claims that her attorneys failed to advise her properly about her appellate rights (she does not claim that she instructed Fontier or Handwerker to file an appeal on her behalf). See Almonte v. United States, No. 06 CR. 460 (DC), 2008 WL 2755818, at *3 n.2 (S.D.N.Y. July 14, 2008). The two-part Strickland test applies to ineffective assistance claims that allegedly forfeited a defendant the chance to appeal. See Sarroca v. United States, 250 F.3d 785, 787 (2d Cir. 2001). With respect to the reasonableness of counsel's representation, a petitioner can either show that there are non-frivolous grounds for appeal that would give "a rational defendant" reasons to want to appeal, or that the petitioner "reasonably demonstrated to counsel" her desire to appeal. Id. (quoting Roe v. Flores-Ortega, 528 U.S. 470, 480 (2000)). "[T]o show prejudice, a [petitioner] must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with [her] about an appeal, [s]he would have timely appealed." Id. (quoting Flores-Ortega, 528 U.S. at 484). "The 'would have appealed' standard considers all of the circumstances, including whether there were nonfrivolous issues to appeal." Id. (quoting Flores-Ortega, 528 U.S. at 485). Factors to consider in assessing counsel's representation include "whether the conviction follows a trial or a guilty plea," "whether the defendant received the sentence bargained

for as part of the plea," and "whether the plea expressly reserved or waived some or all appeal rights." Id. at 788 (quoting Flores-Ortega, 528 U.S. at 480).

The Plea Agreement contained a provision pursuant to which the petitioner waived any right to appeal or to bring a collateral challenge of any sentence of or below the Stipulated Guidelines Range of 96 months' imprisonment. Plea Agr. at 9. The petitioner argues that Schachter did not explain, or incorrectly advised her about, the provisions of the Plea Agreement, including the waiver provision. However, Schachter swears that he reviewed the Plea Agreement with the petitioner on at least eight separate occasions. Schachter Aff. ¶¶ 8, 25. And the petitioner's own e-mail correspondence indicates that she was aware that she could not appeal any sentence of or below 96 months' imprisonment. See Petition, Ex. 2M. The Court carefully reviewed that appeal waiver with the petitioner during the plea allocution, and the petitioner swore that she understood the waiver. Plea Tr. at 29-30. She also swore that she had read the Plea Agreement, discussed it with her lawyers, and that she understood it. Plea Tr. at 29. When the Court sentenced the petitioner principally to 72 months' imprisonment, the Court reiterated that the petitioner had waived any right to appeal the sentence, but urged the petitioner to discuss the issue with her lawyers. Sent. Tr. at 75. Fontier swears that she discussed

the appeal waiver with the petitioner and her family on multiple occasions. Fontier Decl. ¶ 6.

While it is true, as the petitioner argues, that the appeal waiver could not foreclose an appeal regarding the knowing and voluntary nature of the plea, Petition at 193, even though Fontier states that the petitioner had "agreed to waive her right to appeal," Fontier Decl. ¶ 6, there are no plausible allegations that the petitioner would have wanted to file an appeal that was not directed against her sentence (the right to which she had waived), but rather that was directed against the guilty plea. See Song Ping Tian v. United States, No. 03 CR. 567 (DC), 2005 WL 1713056, at *7 (S.D.N.Y. July 22, 2005).

Moreover, the petitioner cannot show that her attorneys should have thought that the petitioner wanted to file a notice of appeal challenging her guilty plea. See Scott v. United States, No. 07-CV-4039 (CBA), 2011 WL 115087, at *5 (E.D.N.Y. Jan. 13, 2011). No rational defendant in the petitioner's situation would have wanted to file such an appeal. As the petitioner's attorneys correctly explained to her in advising against moving to withdraw the guilty plea, there were no nonfrivolous bases to contest the guilty plea. See Pena-Rosario v. United States, No. 07 CIV. 1830 (DLC), 2008 WL 754289, at *2 (S.D.N.Y. Mar. 20, 2008) (finding that the petitioner's inability to identify "non-frivolous issues that would have

warranted an appeal . . . [was] unsurprising because his conviction rested on a plea of guilty and he was sentenced at the bottom of the guidelines range to which he had stipulated in his plea agreement" (citation omitted)). An appeal could have only successfully challenged the agreement to plead guilty, and if successful, resulted in the vacatur of a favorable, below Guidelines sentence, while exposing the petitioner to the far greater liability that she avoided by pleading guilty.

Similarly, the petitioner has failed to demonstrate that she expressed a desire to appeal to her attorneys within the time period to file an appeal from her sentence. The conviction followed a guilty plea, the petitioner received a below Guidelines sentence, and she expressly waived her rights to appeal the sentence of imprisonment, which was below the Stipulated Guidelines Range. See Sarroca, 250 F.3d at 788; United States v. Neal, 27 F. Supp. 3d 302, 309 (N.D.N.Y. 2014). Based on her failure to file a motion to withdraw her guilty plea, her attorneys could reasonably conclude that she would not want to file an appeal that could only result in the same relief: ripping up the Plea Agreement, and thus exposing the petitioner to far greater liability. See Plea Agr. at 10 (tolling the statute of limitations in the event that the petitioner's conviction was vacated). The petitioner's decision to negotiate a loss amount for purposes of forfeiture and

restitution with the Government after sentencing, rather than dispute the issue at a Factico hearing, further indicates that the petitioner "wanted to end the judicial proceedings, not to file an appeal." Scott, 2011 WL 115087, at *5.

For similar reasons, the petitioner cannot demonstrate prejudice because there is no reasonable probability that the petitioner would have filed an appeal had counsel advised her of the limited bases to file an appeal following the guilty plea. See, e.g., Sarroca, 250 F.3d at 789; Song Ping Tian, 2005 WL 1713056, at *7; Scott, 2011 WL 115087, at *6; Neal, 27 F. Supp. 3d at 309. In particular, the failure to move to withdraw the guilty plea before sentencing leads to the conclusion that the petitioner would not have chosen to seek functionally the same relief from the Court of Appeals after sentencing (where the petitioner had received a below Guidelines sentence).

**B.**

The petitioner argues that her attorneys were ineffective for refusing to file a motion to withdraw the guilty plea on her behalf. "[T]he proper question, where a defendant's lawyer declines to move on the defendant's behalf to withdraw a guilty plea, is whether the lawyer's judgment fell outside the bounds of professional competence, so as to constitute ineffective assistance of counsel." United States v. Rivernider, 828 F.3d 91, 108 (2d Cir. 2016). The attorneys' refusal to make the

motion on her behalf was well-within the bounds of professional competence because any such motion would have been frivolous. As explained above, there were no nonfrivolous grounds for withdrawing the guilty plea. The sworn plea allocution showed that the plea was knowing and voluntary, and the petitioner has presented no evidence to suggest otherwise. The petitioner's attorneys correctly recognized that the withdrawal could have undone a favorable plea agreement, and exposed the petitioner to far greater liability. Fontier Decl. ¶ 4.

The petitioner's attorneys fulfilled their duties to the petitioner by advising her that she could represent herself if she so chose. The petitioner's ultimate refusal to represent herself demonstrates that she suffered no prejudice from her attorneys' refusal to make a frivolous motion to withdraw the plea.

### C.

The claim that the petitioner's sentence violated the Eighth Amendment's Cruel and Unusual Punishments Clause, as well as many of the claims for prosecutorial misconduct (such as the claim challenging the decision to prosecute the petitioner in the first place), are predicated on the claim for actual innocence. Because the claim for actual innocence is without merit, it follows that these claims are also without merit.

It should be noted that the petitioner's challenge to her sentence is barred by the Plea Agreement, in which she agreed not to challenge a sentence of or below 96 months' imprisonment. It is also inconsistent with the petitioner's comment elsewhere in her papers that she is "not challenging the sentence imposed by the Court at the sentencing hearing in this petition." Petition at 284. Indeed, any such challenge would be frivolous. The petitioner received a sentence that was more than two years below the statutory maximum, which also became the Stipulated Guidelines Range. See Karimu v. United States, No. 10 CR. 422 (PKC), 2013 WL 4017168, at *4 (S.D.N.Y. Aug. 6, 2013) ("The waiver of the right to collaterally attack a sentence dooms [the petitioner's] claims that . . . his sentence amounts to cruel and unusual punishment.").

The remaining claims of prosecutorial misconduct are unfounded. The Government had a legal basis to restrain the petitioner's assets subject to forfeiture before her conviction. See King, WL 2010 4739791, at *1-2. The restraint of the petitioner's assets did not deprive the petitioner of her choice of counsel in violation of the Sixth Amendment. See Kaley v. United States, 134 S. Ct. 1090, 1103, 1105 (2014). Moreover, the restraint on the petitioner's assets did not affect the petitioner's choice of counsel: her retained counsel,

Handwerker, continued to represent her pursuant to the CJA after she lost the ability to pay his fees.

There is no basis to conclude that the Government fabricated inculpatory evidence against the petitioner, concealed exculpatory evidence from the petitioner, or otherwise acted improperly in the underlying proceedings. The rest of the petitioner's allegations are conclusory, unsubstantiated, and lack merit.

### D.

In an unsigned letter dated February 27, 2017 (purportedly written by the petitioner but sent to the Court by the petitioner's daughter), the petitioner purportedly challenges the sentence calculation by this Court. <u>See</u> Civ. Dkt. 41. For the reasons already discussed, the petitioner's daughter cannot seek relief on the petitioner's behalf. Nonetheless, the argument is obliquely referenced in the Petition, <u>see</u> Petition at 56, and, though not a distinct claim in the Petition, will be addressed here.

The argument is of course barred by the Plea Agreement in which the petitioner agreed not to attack collaterally her sentence. <u>See</u> <u>Garcia-Santos v. United States</u>, 273 F.3d 506, 508 (2d Cir. 2001) (per curiam). As explained above, there is no plausible argument that the petitioner did not knowingly and

voluntarily enter into the Plea Agreement. In any event, the petitioner's argument is without merit.

The petitioner alleges that this Court, in fashioning the petitioner's sentence, failed to consider the correct amount of time that the petitioner had been on "strict restrictive home confinement" while she was on bail, and before she began serving her term of imprisonment. The petitioner claims that the Court credited the petitioner with only 16 months of home confinement, see Sent. Tr. at 67, when it should have credited her with 32 months of home confinement.

The petitioner was arrested on November 30, 2009, and was released on the same date subject to meeting certain bail conditions. On December 14, 2009, after failing to meet those conditions, the petitioner appeared before Magistrate Judge Francis at a bond revocation hearing, and the Magistrate Judge imposed home detention (among other conditions) on the petitioner as a condition of her bail. On March 15, 2011 --- after approximately sixteen months of home confinement --- this Court modified the conditions of the petitioner's bail, including by relieving the petitioner "of any requirement of home confinement." Cr. Dkt. 133. While the petitioner now seeks credit for the full 32 months she was on bail, this Court correctly calculated the period of home confinement in determining an appropriate sentence.

In addition, the petitioner's claim is based on a misapprehension of the law. The period of home confinement was only a factor for the Court to consider in determining her sentence. The Court was not required to afford the petitioner any credit for the time that she had spent in home confinement: "The time spent by [the petitioner] on home confinement with electronic monitoring as part of [her] bail conditions does not qualify as 'official detention,' and [s]he is not entitled to credit toward [her] federal sentence for that time." United States v. Pjetri, No. S4 08 CR. 65-02 (CM), 2014 WL 6851280, at *1 (S.D.N.Y. Dec. 2, 2014) (citing Reno v. Koray, 515 U.S. 50 (1995)).

## IV.

The petitioner requests an evidentiary hearing to review her claims. However, because the motion and the files and records of the case conclusively show that the petitioner is entitled to no relief, no hearing is required. See Ochoa-Suarez v. United States, Nos. 07 Civ. 9275, 03 Cr. 747, 2008 WL 2220637, at *4 (S.D.N.Y. May 27, 2008) (citing 28 U.S.C. § 2255(b)); see also Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (a district court has discretion to rely on documentary evidence in deciding habeas petition, and need not conduct a "full-blown testimonial hearing" when in-court testimony "would not offer any reasonable chance of altering

[the court's] view of the facts"); <u>Perez v. United States</u>, No.
07 CIV. 11179 (JGK), 2008 WL 2775856, at *5 (S.D.N.Y. July 1,
2008). No hearing or additional discovery can change the fact
that the petitioner's claims are time-barred. Moreover, the
record is sufficient to conclude that all of the Petition's
claims are without merit.

### CONCLUSION

The Court has considered all of the arguments raised by the
parties. To the extent not specifically addressed, the arguments
are either moot or without merit. For the foregoing reasons, the
petitioner's motion pursuant to 28 U.S.C. § 2255 is **denied**. The
Clerk is directed to enter judgment dismissing the Petition and
closing this case. The Court declines to issue a certificate of
appealability because the petitioner has failed to make a
substantial showing of the denial of a constitutional right
pursuant to 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

**Dated:     New York, New York**
           **April 25, 2017**     _____/s/_____
                                  **John G. Koeltl**
                                  **United States District Judge**